**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BRANDEE ANDERSON,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CITY OF PHILADELPHIA, ALEX DeSANTIS, CHERELLE PARKER, VANESSA GARRETT-HARLEY, and JOSEPH GRACE,**<br><br>**Defendants.** | **CIVIL ACTION NO. 2:26-cv-05266-JHS**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Brandee Anderson, by and through her attorneys, Bell & Bell LLP, hereby files the following Amended Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1. This is an action for an award of damages and other relief on behalf of Plaintiff Brandee Anderson (hereinafter "Plaintiff" or "Ms. Anderson"), a former employee of the City of Philadelphia (hereinafter the "City"). Despite her loyalty and consistent performance, Ms. Anderson was subjected to discrimination and harassment on the basis of her race and sex, and to retaliation for opposing and reporting discrimination and harassment, culminating in her wrongful termination on July 22, 2025.

2. Following her termination, Defendants Alex DeSantis, Cherelle Parker, and Joseph Grace made and published false and defamatory statements concerning Ms. Anderson, branding her publicly as having engaged in workplace misconduct and wrongdoing when they knew she had not. Defendants further retaliated against Ms. Anderson for her post-termination

protected speech, including by pressuring a private broadcaster to cancel her radio interview.

3. This action arises under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, et seq. ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), 42 U.S.C. § 1983 ("Section 1983"), the First Amendment to the United States Constitution, and the common law of the Commonwealth of Pennsylvania.

## JURISDICTIONAL STATEMENT

4. This Court has original jurisdiction over all civil actions arising under the Constitution, laws or treaties of the United States pursuant to 28 U.S.C. § 1331.

5. The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.

6. This Court has supplemental jurisdiction over any Pennsylvania state law claims pursuant to 28 U.S.C. § 1367.

7. All conditions precedent to the institution of this suit have been fulfilled. On January 15, 2026, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint with the Pennsylvania Human Relations Commission ("PHRC"). The Charge was assigned EEOC No. 530-2026-02850. On July 23, 2026, the EEOC issued a Notice of

Right to Sue to Plaintiff. This action was filed within ninety (90) days of Plaintiff's receipt of said Notice.[1]

## VENUE

8. This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b).

9. This action properly lies in the Eastern District of Pennsylvania because significant activities associated with the claims alleged took place in this jurisdiction and because Plaintiff was employed and terminated by the City in this jurisdiction.

## PARTIES

10. Plaintiff Brandee Anderson is an adult, African American, female citizen and resident of Philadelphia, Pennsylvania and the United States of America.

11. Defendant City of Philadelphia is a municipal corporation organized under the laws of the Commonwealth of Pennsylvania, with offices located at 1400 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19107, where Plaintiff was employed.

12. Defendant Alex DeSantis is an adult individual who, at all relevant times, served as the Inspector General of the City of Philadelphia.

13. Defendant Cherelle Parker is an adult individual who, at all relevant times, served as the Mayor of the City of Philadelphia.

14. Defendant Joseph Grace is an adult individual who, at all relevant times, served as the Director of Communications for the Mayor of the City of Philadelphia.

[1] It has been less than one year since Plaintiff dual-filed her EEOC Charge as a Complaint with the PHRC. Ms. Anderson will seek to amend her Complaint in this matter once she has exhausted administrative remedies with respect to her claims pursuant to the Pennsylvania Human Relations Act ("PHRA").

15. Defendant Vanessa Garrett-Harley is an adult individual who, at all relevant times, served as the Chief Deputy Mayor of the City of Philadelphia.

16. At all relevant times, Defendant City of Philadelphia is and has been an employer employing more than five hundred (500) employees.

17. At all relevant times, employees of Defendant City of Philadelphia acted as agents and servants for the City of Philadelphia, except as to Count IV herein.

18. At all relevant times, employees of Defendant City of Philadelphia were acting within the scope of their authority and in the course of their employment under the direct control of the City of Philadelphia, except as to Count IV herein.

19. At all times material hereto, Defendant City of Philadelphia acted by and through its authorized agents, servants, workers and/or employees acting within the course and scope of their employment with the City of Philadelphia and in furtherance of the City of Philadelphia's business.

20. At all relevant times hereto, Plaintiff was an "employee" of Defendant City of Philadelphia within the meaning of the laws at issue in this suit and is accordingly entitled to the protection of said laws.

21. At all relevant times hereto, Defendant City of Philadelphia was an "employer" and/or "person" under the laws at issue in this matter and is accordingly subject to the provisions of said laws.

22. This Honorable Court has personal jurisdiction over the Defendants.

23. At all relevant times, Mayor Parker was the final policymaker for the City of Philadelphia with respect to the personnel actions and public communications at issue in this Complaint.

24. The Inspector General is appointed by, reports directly to and serves at the pleasure and subject to the direction of, the Mayor pursuant to Executive Order 2014-07.

25. The unlawful acts alleged herein were undertaken by, or were ratified by, the City's final policymakers, including Mayor Parker, and reflect the official policy, custom, and practice of the City of Philadelphia.

## FACTS

### Ms. Anderson's Employment and Qualifications

26. Ms. Anderson is an attorney and a nationally recognized leader in diversity, equity, and inclusion.

27. She earned a Juris Doctor from Columbia Law School, where she served on the editorial board of the Columbia Journal of Race and Law, and a Master of Science in Education from the University of Pennsylvania Graduate School of Education.

28. A former Teach For America corps member, Ms. Anderson taught English Language Arts and Social Studies at Sankofa Freedom Academy Charter School.

29. She currently teaches Critical Race Studies at Drexel University's Thomas R. Kline School of Law and is the founder and Chief Executive Officer of The Antiracism Academy.

30. Ms. Anderson's public-service leadership includes service as a presidential appointee at the U.S. Department of Commerce, Minority Business Development Agency, and as the former Chief Diversity, Equity, and Inclusion Officer for the City of Philadelphia.

31. Ms. Anderson was first hired by the City in or about 2022, serving as Chief Racial Equity Strategist under then-Mayor Kenney.

32. In or about 2022, Ms. Anderson reported sexual harassment by her then-supervisor.

33. Shortly after her report, her supervisor was informed of the report and Ms. Anderson was terminated.

34. In or about October 2024, Ms. Anderson began a new position with the City as Chief Diversity, Equity & Inclusion Officer, also titled Director of the Office of Diversity, Equity and Inclusion, serving under Defendant Mayor Cherelle Parker.

35. Ms. Anderson's prior report of sexual harassment and her prior termination were known to Mayor Parker and her senior staff when they hired Ms. Anderson in October 2024.

36. During her September 5, 2024 final-round interview, Ms. Anderson disclosed to Mayor Parker and Chief of Staff Tiffany Thurman that she had reported sexual harassment in 2022 and had been terminated shortly thereafter, placing the City's decisionmakers on notice of her protected-activity history before they hired her.

37. On or about October 24, 2024, Chief Administrative Officer Camille Duchaussee acknowledged that the City had failed Ms. Anderson in 2022 and that she had later "helped get rid of" the 2022 harasser.

38. Throughout her employment with the City, Ms. Anderson excelled in her position and performed her duties in a competent, loyal, and dedicated manner.

39. As Chief Diversity, Equity and Inclusion Officer, Ms. Anderson led the Office of Diversity, Equity and Inclusion, which included the Office of LGBTQ+ Affairs. She was responsible for overseeing implementation of the City's DEI-related Executive Orders, which included the City's Budgeting for Racial Equity process, departmental Racial Equity Action Plans, citywide DEI training, and policy and strategic direction for the Office of Economic Opportunity.

40. During her employment as Chief Diversity, Equity & Inclusion Officer, Ms. Anderson never received any disciplinary action, verbal warning, written warning, or write-up, and she never received any performance review, evaluation, or performance improvement plan.

**The Undermining of Ms. Anderson's Authority**

41. Despite her qualifications and performance, Ms. Anderson was subjected to discrimination and harassment on the basis of her race and sex, and to retaliation, culminating in her wrongful termination on July 22, 2025.

42. At the outset of her employment, HR Manager Angela Grady told Ms. Anderson that she had no authority to hire, discipline, or fire her staff members, effectively stripping Ms. Anderson of her leadership capacity.

43. For example, Ms. Anderson supervised the Office of LGBTQ+ Affairs, but Tyrell Brown was hired as Director of LGBTQ+ Affairs over Ms. Anderson's objection. Even though Brown was a direct report of Ms. Anderson, approval for Brown's speaking engagements and discipline for Brown's performance issues was left to someone senior to Ms. Anderson.

44. By contrast, other senior leaders in the Parker Administration did have the authority to manage their own staff. For example, Joseph Grace, the Director of Communications, terminated a member of his staff, Nandi O'Connor, a Black woman. Mr. Grace is a white male.

45. Deputy Chief of Staff Chris Dailey voiced to Ms. Anderson a list of grievances against two of her direct reports, framing them as problems for Ms. Anderson to inherit.

46. Mayor Parker stated that she did not care about Ms. Anderson's "DEI ideology," only minority business, and warned Ms. Anderson not to contact friends or classmates serving on City Council.

47. At several meetings with Ms. Anderson and other senior leaders, Mayor Parker indicated that the City would "not tolerate in any way, shape, or form anyone who doesn't embrace [the mayor's] agenda or tries to work around it."

48. Chief Deputy Mayor Vanessa Garrett-Harley ordered DEI leaders and staff to "stand down," forbade them from speaking publicly on equity, and warned that dissent would not be tolerated.

49. Ms. Garrett-Harley told Ms. Anderson, "If you can't align with the Mayor's strategy, DEI may not be the job for you."

50. Although City Policy encouraged employees to bring harassment and discrimination concerns to the Office of DEI, when Ms. Anderson escalated reports of harassment and discrimination to HR, she was reprimanded.

51. Ms. Garrett-Harley questioned Ms. Anderson's authority to report anything that came from outside of her direct reports, and instructed Ms. Anderson to stand down.

52. Ms. Garrett-Harley warned Ms. Anderson not to "weaponize DEI against HR," recasting Ms. Anderson's compliance duties as insubordination.

53. Ms. Anderson's colleagues, including Chief Human Resources Officer Candi Jones and Chief Administrative Officer Camille Duchaussee, had been told not to work with her, and Ms. Anderson was met with silence and repeated cancellations of meetings and projects.

54. Since Ms. Anderson's job was to protect employees, her role uniquely depended on working with HR.

55. The instructions she received, therefore, to stand down, and the instructions HR received not to work with Ms. Anderson, made it impossible for Ms. Anderson to perform her job, including her work on budgeting, departmental planning and training.

**The Directive to Target a Transgender Colleague**

56. Shortly after Ms. Anderson's hire, Ms. Garrett-Harley instructed her to "document Celena [Morrison] out," directing Ms. Anderson to build a case for the termination of Celena Morrison, then the Executive Director of LGBTQ+ Affairs.

57. When Ms. Morrison's employment was discussed, Ms. Garrett-Harley said it would ultimately be the Mayor's decision to make.

58. Ms. Anderson made clear that she would not participate in sex discrimination, harassment, or retaliation.

59. When Ms. Morrison later raised discrimination concerns, Ms. Garrett-Harley accused Ms. Anderson of "betraying" her by relaying those complaints.

60. Ms. Garrett-Harley mocked Ms. Morrison during a meeting with HR Manager Angela Grady and a labor attorney, derisively remarking that Morrison used a "deep male tone" to intimidate staff.

**Additional Hostile-Environment and Retaliation Allegations**

61. On or about February 13, 2025, Ms. Anderson flagged a "blackface" caricature in the City newsletter as being problematic and discriminatory.

62. Ms. Garrett-Harley called it "horrific" but immediately shifted to optics focused on preventing the incident from "lighting a fire with the Inquirer, Channel 6, and 30,000 employees" rather than addressing the underlying conduct.

63. On or about May 6, 2025, Ms. Anderson disclosed to Chief Deputy Mayor Garrett-Harley (after first informing Associate Deputy Mayor Jessica Shapiro) that she was a survivor of rape by a former federal superior, Jessica Cavazos, then a criminal defendant.

64. Ms. Garrett-Harley responded by inappropriately questioning how one woman could rape another, and acknowledged the disclosure only after Ms. Anderson sent, on May 7, 2025, a text message reflecting the criminal charges against Ms. Cavazos.

65. In June 2025, Ms. Anderson submitted a written request for time off to attend Ms. Cavazos's preliminary hearing, which was later continued to August 2025.

66. Ms. Anderson was terminated on July 22, 2025 while that written request remained pending.

67. Between December 2024 and February 2025, the City engaged in a sustained effort to suppress diversity, equity, and inclusion activity, including directives to "stand down," warnings not to "weaponize DEI against HR," a February 3, 2025 directive centralizing all public messaging under the City Solicitor, and a February 27, 2025 directive to rebrand DEI as "organizational effectiveness."

68. On or about June 10, 2025, Mayor Parker stated to Ms. Anderson and other senior leaders that "my name is on the ballot," that no one "has a right to have an opinion about where we are going," and that cause for removal existed for anyone who would "undermine or go around" her.

69. All DEI decisions had to be run by Mayor Parker, especially given the federal climate.

70. After the federal anti-DEI executive orders began issuing in January 2025, Mayor Parker made City Solicitor Renee Garcia, a white woman, "the authority on all things DEI." DEI messaging and authority were centralized under Ms. Garcia.

71. Ms. Anderson escalated to Ms. Garrett-Harley emails documenting children endangered in the City's care; Ms. Garrett-Harley instructed her to delete the emails.

72. In May 2025, Ms. Anderson elevated a report by the Director of the Office of Economic Opportunity of a staff member who had been reported for sexual harassment but had avoided any consequences due to being protected by the union. Ms. Garrett-Harley and Associate Deputy Mayor Jessica Shapiro reprimanded Ms. Anderson for having elevated the report and put it in writing, saying that the Office of Economic Opportunity should have been the one to report it, not Ms. Anderson.

73. The Office of Economic Opportunity, however, reported to the Office of Diversity, Equity and Inclusion, therefore bringing this matter to Ms. Anderson's attention was within the chain of command.

74. On June 13, 2025, Ms. Anderson elevated a report of race and gender discrimination and retaliation by an employee in the Office of the City Controller, Deborah Ming. Ms. Ming had originally gone to Chief HR Officer Candi Jones in April, but received no response. Ms. Ming then reported the discrimination to Inspector General DeSantis, who told Ms. Ming that there was nothing his office could do. Ms. Ming finally reported the matter to Ms. Anderson, who raised Ms. Ming's complaint to Associate Deputy Mayor Jessica Shapiro on June 12, 2025, and on June 13, 2025, Ms. Anderson escalated it by phone to Ms. Shapiro and Inspector General DeSantis. Ms. Garrett-Harley also knew of Ms. Anderson's escalation; Ms. Shapiro told her, and Ms. Anderson told her directly in mid-June 2025.

**Ms. Anderson's Report of Sexual Harassment**

75. On or about July 2, 2025, Director of LGBTQ+ Affairs Tyrell Brown, a direct report of Ms. Anderson who is Black and identifies as non-binary, reported to Ms. Anderson that Deputy Chief of Staff Chris Dailey had sent Brown a sexual image via the Sniffies application.

76. Mr. Dailey, as Deputy Chief of Staff, supervised staff throughout the Mayor's Office, directly supervised the Office of Diversity, Equity and Inclusion before Ms. Anderson's arrival, and was Ms. Anderson's direct supervisor at the start of her tenure.

77. On July 7, 2025 – the Monday following the July 4 weekend – Ms. Anderson spoke with an attorney in the City's Law Department for guidance on how to handle Tyrell Brown's disclosure.

78. On or about July 10, 2025, after the Law Department attorney consulted with colleagues in the Labor Unit and got back to her, Ms. Anderson reported the matter in person to HR Manager Angela Grady, and by phone to Ms. Garrett-Harley the same day.

79. Ms. Grady acknowledged the report in writing, thanked Ms. Anderson for elevating it, and confirmed that HR was investigating the matter, including escalation to Chief Human Resources Officer Candi Jones and Chief Administrative Officer Camille Duchaussee.

80. On or about July 11, 2025, Inspector General Alex DeSantis conducted and recorded witness interviews concerning the report.

81. On or about July 15, 2025, Ms. Anderson emailed Mr. DeSantis seeking clarity regarding the investigation and documenting her good-faith participation.

82. On or about July 16, 2025, Mr. DeSantis responded to Ms. Anderson, confirming that the record reflected her report to Human Resources and that she had participated in good faith in the interview and investigation.

83. Mr. DeSantis also informed Ms. Anderson on July 16, 2025 that he was conducting the investigation and gathering the facts, but that ultimately it would be up to Ms. Garrett-Harley and other leadership to make any decisions regarding the outcome of the investigation and any action to be taken as a result.

**Retaliation and Wrongful Termination**

84. Within days of Ms. Anderson's report of sexual harassment, the City began to retaliate against her.

85. On or about July 15, 2025, Ms. Garrett-Harley directed Ms. Anderson to withdraw from participating as a panelist at a Bar Association Meeting that was scheduled the next day, July 16, 2025, even though leadership had approved the appearance back in June. Ms. Garrett-Harley cited the pending OIG investigation as the reason to withdraw from this speaking engagement.

86. To explain the last-minute cancellation, Ms. Garrett-Harley instructed Ms. Anderson to tell the Bar that she had a family emergency. Ms. Anderson did so, even though it was not true.

87. On July 22, 2025, only twelve (12) days after Ms. Anderson reported the sexual harassment, the City terminated her employment.

88. The termination letter, issued on the letterhead of the Office of the Mayor and signed by Chief Human Resources Officer Candi Blosom Jones, stated that Ms. Anderson was terminated following a review of "recent conduct, judgment lapses, and confirmed

violations of the City's Sexual Harassment Policy," and further stated that she had "disregarded guidance and direction and that has further eroded trust."

89. During the termination meeting, Chief HR Officer Candi Jones acknowledged that Ms. Anderson had not distributed the image to anyone.

90. Ms. Anderson was faulted for other people being in the room when Tyrell Brown disclosed receiving the image from Chris Dailey, even though Ms. Anderson had no control over when Tyrell Brown chose to report this information.

91. Ms. Garrett-Harley stated that Ms. Anderson was punished more harshly because of her senior position as Chief Diversity Officer and she should know better.

92. Ms. Anderson never possessed or distributed the sexual image.

93. She reported the matter to Human Resources.

94. Chris Dailey, who is senior to Ms. Anderson and who actually sent the sexual image to Brown, is White.

95. Mr. Dailey was not terminated.

96. Instead, he was retained and later transferred laterally, with no loss of compensation.

97. Ms. Anderson and Brown, both Black, were terminated, while Mr. Dailey, who is White and who actually sent the image, kept his job.

98. The City's stated reasons for Ms. Anderson's termination have shifted over time.

99. At the time of her termination, Ms. Anderson was told that her termination related to the semi-nude photograph of Mr. Dailey.

100. The City also later claimed that Ms. Anderson was terminated for reporting the incident too late, despite the fact that the policy the City invoked sets no timeline for reporting.

101. Ms. Garrett-Harley raised concerns about the delay in reporting, yet acknowledged that Ms. Anderson had called Ms. Garrett-Harley on the evening of July 10 – the same day it was reported to HR – to tell her about the incident. Ms. Garrett-Harley's response that evening was to instruct Ms. Anderson not to tell Jessica Shapiro, and to keep it in "the strictest and highest confidence."

102. During the termination meeting, Ms. Garrett-Harley also cited Ms. Anderson's involvement in HR problems, after being instructed to stand down, as a reason for her termination.

103. Ms. Anderson received no prior discipline, warning, or performance improvement plan before her termination.

104. Given her treatment during her employment with the City and the circumstances surrounding her termination, Ms. Anderson maintains that she was discriminated against and harassed on the basis of her race and sex, that she was retaliated against for opposing and reporting discrimination and harassment, and that her termination was a result of discrimination and retaliation.

105. Based on the foregoing, Ms. Anderson was subjected to discrimination and harassment on the basis of her race and sex, and retaliated against for opposing and reporting discrimination and harassment, in violation of Title VII and Section 1981.

106. Ms. Anderson has suffered mental anguish and severe emotional distress as a direct and proximate result of the actions and inactions of Defendant City of Philadelphia.

107. Defendant City of Philadelphia and its agents acted with the intent of causing, or with reckless disregard for the probability that their actions would cause, Ms. Anderson severe emotional distress.

108. Defendant City of Philadelphia willfully violated Title VII and Section 1981, as it knew that its actions violated the statutes and/or acted with reckless disregard as to whether its actions violated Title VII and Section 1981.

109. Ms. Anderson has suffered financial losses, which include, among other things, lost wages, and an obligation for attorneys' fees and costs of bringing suit, as a direct and proximate result of the actions and inactions of Defendant City of Philadelphia.

**Defendants' Defamatory Statements**

110. After Ms. Anderson's termination, Defendants DeSantis, Parker, and Grace made and published false and defamatory statements concerning Ms. Anderson, publicly branding her as having engaged in workplace misconduct and wrongdoing.

111. On or about July 25, 2025, the Philadelphia Inquirer published an article concerning the terminations of Ms. Anderson and Brown.

112. In that article, Defendant Joseph Grace, the Mayor's Director of Communications, stated on behalf of the Parker Administration: "We vehemently disagree with many of the former employee's allegations and outright misstatements of fact."

113. Defendant Grace made this statement without privilege to do so, knowing it to be false, malicious, and misleading, and suggesting that Ms. Anderson had made dishonest and untrue public statements when, in fact, Ms. Anderson's account was accurate and Defendant Grace knew that Ms. Anderson had not engaged in any misconduct.

114. On or about August 14, 2025, Defendant Alex DeSantis appeared on the radio program "Headlines with Frankie Darcell" on WDAS 105.3 FM and made statements concerning Ms. Anderson, including: "Brandee Anderson did something wrong." Defendant DeSantis' interview aired on or about August 23, 2025.

115. During the same broadcast, Defendant DeSantis stated that Ms. Anderson "mishandled the photograph", showed "poor judgment", handled the photograph situation "unprofessionally", she "misunderstands and mischaracterizes the photograph received," and that she "continues to mishandle the information, handle it unprofessionally."

116. DeSantis further stated during that broadcast that Ms. Anderson's conduct "looks like … a violation of our workplace policy" and that Ms. Anderson handled the incident "with disregard for the privacy of the other two individuals."

117. During the same broadcast, Defendant DeSantis stated: "The concept that she is quoted reporting sexual misconduct is not correct," and that Ms. Anderson's description of the photograph as unsolicited was "not correct."

118. During the same broadcast, Defendant DeSantis stated that the administration "did the right thing to let these individuals go," and that he had advised the administration that "it was necessary to take action."

119. On or about September 4, 2025, the Philadelphia Inquirer published an article in which Defendant DeSantis stated that Ms. Anderson and Mr. Brown had acted "highly unprofessionally," that Ms. Anderson "really failed to properly contain the situation," and that her conduct "constituted violations" of the City's sexual harassment policy, for which he recommended that Mayor Parker fire her.

120. In the same article, Defendant DeSantis further stated that Ms. Anderson allowed the photograph to be shared "in a manner that was somewhat disparaging to the subject of the photo."

121. In the same article, Defendant DeSantis stated that he felt an obligation "to clarify some of the false information that she's put out there," and that he hoped Ms. Anderson could "move on from this and realize that she did do something wrong."

122. Defendant DeSantis made these statements without privilege to do so, knowing them to be false, malicious, and misleading, and suggesting that Ms. Anderson had engaged in misconduct and wrongdoing when, in fact, Defendant DeSantis knew that Ms. Anderson had not engaged in any misconduct.

123. Indeed, Defendant DeSantis had confirmed in writing on July 16, 2025 that Ms. Anderson reported the matter to Human Resources and participated in good faith, and he acknowledged that Ms. Anderson never possessed the photograph.

124. On or about July 30, 2025, in a follow-up Philadelphia Inquirer article in which the City claimed that the Inspector General's investigation justified Ms. Anderson's firing, Defendant Mayor Cherelle Parker stated: "I don't think any credible individual can seriously doubt our ironclad commitment to diversity, equity, and inclusion."

125. Defendant Parker made this statement in direct response to Ms. Anderson's statements, published five days earlier in the July 25, 2025 Philadelphia Inquirer article, that the administration did not value diversity, equity, and inclusion.

126. Read together, Defendant Parker's statement was reasonably understood to brand Ms. Anderson, the identifiable subject of the ongoing public controversy, as not credible and as having made false public statements.

127. Defendant Parker made this statement, and caused the administration to publicly attribute Ms. Anderson's termination to the Inspector General's investigation, without privilege to do so, knowing the resulting implication to be false, malicious, and misleading, and

suggesting that Ms. Anderson had engaged in misconduct warranting her termination when, in fact, Defendant Parker knew that Ms. Anderson had not engaged in any misconduct.

128. The persons to whom Defendants published the aforesaid false statements understood the defamatory meaning of the statements and their application to Ms. Anderson.

129. The aforesaid statements by Defendants DeSantis, Parker, and Grace were knowingly false when made and were published to others with actual malice.

130. As a result of the defamatory statements made by Defendants, Ms. Anderson has suffered harm to her reputation, embarrassment, humiliation, and mental anguish, and diminished professional prospects in public service, academia, and DEI consulting.

**Post-Termination Retaliation for Protected Speech**

131. After her termination, Ms. Anderson spoke publicly, as a private citizen, on matters of public concern, including the City's suppression of diversity, equity, and inclusion work and activities, its treatment of and retaliation against employees who report discrimination and harassment, and its handling of a report of misconduct involving a senior aide.

132. In response to that speech, Defendants Grace and DeSantis contacted iHeartMedia, including Senior Vice President of Programming Derrick Corbett, and pressured the station to cancel Ms. Anderson's scheduled interview on WDAS and to demand that she not identify individuals.

133. The pressure conveyed the threat of litigation and other adverse consequences if the interview proceeded.

134. An August 16, 2025 email from Defendant Grace memorializes the effort.

135. Programming Senior VP Derrick Corbett told Frankie Darcell, the radio personality scheduled to interview Ms. Anderson, that Ms. Anderson was not allowed to name names during her interview, and if she did so, Ms. Darcell would be personally liable for any defamation claim brought by the Mayor.

136. On or about August 6, 2025, Deputy Chief Administrative Officer Sandra Carter messaged Ms. Anderson that "[Mayor Parker] absolutely knows what's going on," confirming the Mayor's knowledge and ratification of the conduct alleged herein.

**COUNT I**
**Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.**
**(Anderson v. City of Philadelphia)**

137. Plaintiff Brandee Anderson repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

138. Based on the foregoing, Defendant City of Philadelphia engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, et seq.

139. In discriminating against and harassing Ms. Anderson because of her race and sex, and in retaliating against Ms. Anderson for opposing and reporting discrimination and harassment, Defendant City of Philadelphia violated Title VII.

140. Defendant's violations were intentional and willful.

141. As the direct and proximate result of the aforesaid unlawful employment practices engaged in by Defendant City of Philadelphia, Plaintiff Brandee Anderson has sustained a loss of earnings and earning potential, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

**COUNT II**
**42 U.S.C. § 1983 - Vindicating Rights Under 42 U.S.C. § 1981: Race Discrimination, Harassment and Retaliation**
**(Anderson v. City of Philadelphia, Alex DeSantis, and Vanessa Garrett-Harley)**

142. Plaintiff Brandee Anderson repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

143. Section 1981 guarantees Plaintiff the right to be free from race discrimination and retaliation in the making, performance, and termination of her employment relationship.

144. The exclusive federal remedy for a municipal actor's violation of Section 1981 is 42 U.S.C. § 1983.

145. Plaintiff accordingly brings this Count pursuant to Section 1983 to vindicate her rights under Section 1981.

146. In discriminating against and harassing Ms. Anderson on the basis of her race, and in retaliating against Ms. Anderson for opposing and reporting discrimination and harassment, Defendants violated Ms. Anderson's rights secured by Section 1981.

147. Defendant City of Philadelphia, acting through its final policymaker and pursuant to official policy, custom, or ratification, is liable under Section 1983.

148. Defendants Garrett-Harley and DeSantis, acting under color of state law and through their personal participation in the discrimination and retaliation, are individually liable under Section 1983.

149. Said violations were intentional and willful.

150. Said violations warrant the imposition of punitive damages as to the individual Defendants, Garrett-Harley and DeSantis.

151. As a direct and proximate result of the unlawful practices alleged herein, Plaintiff has sustained a loss of earnings, severe emotional and psychological distress, loss of self-

esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

152. Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendants' actions unless and until this Court grants the relief requested herein.

**COUNT III**
**42 U.S.C. § 1983 - First Amendment Retaliation**
**(Anderson v. City of Philadelphia, Alex DeSantis, Joseph Grace and Cherelle Parker)**

153. Plaintiff Brandee Anderson repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

154. Following her termination, Ms. Anderson spoke publicly, as a private citizen, on matters of public concern.

155. Her speech was protected by the First Amendment to the United States Constitution.

156. In retaliation for that protected speech, Defendants engaged in a campaign to punish and silence Ms. Anderson, including by publicly disparaging her and by pressuring iHeartMedia, a private broadcaster, to cancel her scheduled WDAS interview and to bar her from identifying individuals.

157. A government official may not use the power of that official's office to coerce a private intermediary into punishing or suppressing disfavored speech.

158. As alleged herein, the conduct of Defendants DeSantis, Grace and Parker, viewed in context, could reasonably be understood to convey a threat of adverse government action in order to punish or suppress Ms. Anderson's speech.

159. The conduct of Defendants DeSantis, Grace and Parker was undertaken under color of state law and would deter a person of ordinary firmness from exercising First Amendment rights.

160. Defendant City of Philadelphia is liable because the conduct was undertaken by, or ratified by, the City's final policymaker, Mayor Parker, and reflects official policy, custom, or practice.

161. As a direct and proximate result, Ms. Anderson has suffered reputational, professional, emotional, and economic harm, entitling her to compensatory damages, punitive damages as to the individual Defendants, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**COUNT IV**
**Defamation**
**(Anderson v. Alex DeSantis, Joseph Grace and Cherelle Parker)**

162. Plaintiff Brandee Anderson repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

163. On or about July 25, 2025, the Philadelphia Inquirer published an article in which Defendant Joseph Grace, speaking on behalf of the Parker Administration, stated of Ms. Anderson: "We vehemently disagree with many of the former employee's allegations and outright misstatements of fact."

164. Defendant Grace made this statement without privilege to do so, knowing it to be false, malicious, and misleading, and suggesting that Ms. Anderson had made dishonest and untrue public statements when, in fact, Ms. Anderson's account was accurate and she had not engaged in any misconduct.

165. On or about August 14, 2025, Defendant DeSantis gave a recorded statement for broadcast on "Headlines with Frankie Darcell" on WDAS 105.3 FM, which aired on or about August 23, 2025. Defendant Alex DeSantis stated, in reference to Ms. Anderson, "Brandee Anderson did something wrong," that she "mishandled the photograph," that she continued to "handle it unprofessionally," and that "the mayor and the administration did the right thing to let these individuals go."

166. During the same broadcast, Defendant DeSantis further stated that "the concept that she is quoted reporting sexual misconduct is not correct," falsely suggesting that Ms. Anderson had not engaged in protected activity but instead had committed wrongdoing.

167. On or about September 4, 2025, the Philadelphia Inquirer published an article in which Defendant DeSantis stated that Ms. Anderson had acted "highly unprofessionally," that she "really failed to properly contain the situation," and that her conduct "constituted violations" of the City's sexual harassment policy, and in which he stated that he sought to "clarify some of the false information that she's put out there" and hoped that Ms. Anderson could "realize that she did do something wrong."

168. Defendant DeSantis further stated that Ms. Anderson allowed the photograph to be shared "in a manner that was somewhat disparaging to the subject of the photo."

169. Defendant DeSantis made these statements without privilege to do so, knowing them to be false, malicious, and misleading, and suggesting that Ms. Anderson had engaged in misconduct and wrongdoing when, in fact, Defendant DeSantis knew that Ms. Anderson had not engaged in any misconduct. Defendant DeSantis had confirmed in writing on July 16, 2025 that the record reflected Ms. Anderson's report to Human Resources and her

good-faith participation in the investigation, and he acknowledged that Ms. Anderson never possessed the photograph.

170. On or about July 30, 2025, in a follow-up Philadelphia Inquirer article in which the City claimed that the Inspector General's investigation justified Ms. Anderson's firing, Defendant Cherelle Parker stated, "I don't think any credible individual can seriously doubt our ironclad commitment to diversity, equity, and inclusion."

171. Defendant Parker made this statement in direct response to Ms. Anderson's statements, published five days earlier in the July 25, 2025 Philadelphia Inquirer article, that the administration did not value diversity, equity, and inclusion; read together, the statement was reasonably understood to brand Ms. Anderson as not credible and as having made false public statements.

172. Defendant Parker made this statement, and caused the administration to publicly attribute Ms. Anderson's termination to the Inspector General's investigation, without privilege to do so, knowing the resulting implication to be false, malicious, and misleading, and suggesting that Ms. Anderson had engaged in misconduct warranting her termination when, in fact, Defendant Parker knew that Ms. Anderson had not engaged in any misconduct.

173. Defendants DeSantis, Parker, and Grace made the aforesaid defamatory statements knowing them to be false, in a malicious effort to paint Ms. Anderson in a negative light to the public, while knowing that Ms. Anderson had not engaged in any misconduct.

174. The persons to whom Defendants published the false statements understood the defamatory meaning of the statements and their application to Ms. Anderson.

175. The aforesaid communications by Defendants DeSantis, Parker, and Grace were knowingly false when made and published to others with actual malice.

176. Disseminating false accusations about a former employee to the news media and on commercial radio was not part of, or reasonably related to, the official duties of Defendants DeSantis, Parker or Grace.

177. This is particularly so in light of the City's stated policy that it "does not comment on personnel matters."

178. Each defamatory statement alleged above was made with actual malice and constitutes willful misconduct. Defendants DeSantis, Parker, and Grace knew the statements were false when they made them.

179. They made the statements intending to injure Ms. Anderson's professional reputation, or knowing that such injury was substantially certain to follow.

180. Ms. Anderson was in fact injured, as alleged herein.

181. Because the conduct alleged constitutes actual malice and willful misconduct, Defendants DeSantis, Parker, and Grace are not entitled to official immunity for it

182. As a result of the defamatory statements made by Defendants, Ms. Anderson has suffered harm to her reputation, embarrassment, humiliation, and mental anguish.

183. The harm to Ms. Anderson’s reputation is evidenced by, among other things, the lasting mark on her public image and professional reputation, and her diminished prospects in public service, academia, and DEI consulting following the defamatory statements alleged herein.

## PRAYER FOR RELIEF

184. Plaintiff Brandee Anderson repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Brandee Anderson respectfully requests that this Court enter judgment in her favor and against Defendants, and Order:

a. Appropriate equitable relief, including reinstatement or front pay;

b. Defendants to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been subjected to unlawful discrimination, harassment, and retaliation;

c. Defendants to compensate Plaintiff with the wages and other benefits and emoluments of employment lost because of their unlawful conduct;

d. The individual Defendants to pay Plaintiff punitive damages;

e. Defendants to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment, harm to reputation, and other nonpecuniary losses as allowable;

f. Defendants to pay Plaintiff's costs of bringing this action, including, but not limited to, Plaintiff's attorneys' fees;

g. An order requiring the City to correct the public record and Plaintiff's personnel file, including retraction of the defamatory statements alleged herein;

h. Plaintiff be granted any and all other remedies available pursuant to Title VII, Section 1983, and Pennsylvania common law; and

i. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff Brandee Anderson hereby demands trial by jury as to all issues so triable.

**BELL & BELL LLP**

By: */s/ Christopher A. Macey, Jr.*
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
One Penn Center
1617 JFK Blvd. - Suite 1254
Philadelphia, PA 19103
(215) 569-2500

*Attorneys for Plaintiff Brandee Anderson*

Dated: November 9, 2026